## DICKINSON et al. v. CONSOLIDATED TRACTION CO. et al.

(Circuit Court, D. New Jersey. February 13, 1902.)

1. CORPORATIONS—SUIT BY STOCKHOLDER—ANNULMENT OF EXECUTED CONTRACTS.

Where the management of a number of street railroad lines was consolidated in a single company by means of leases executed by the several companies owning the same, with the approval of a majority of their stockholders, and the lessee has gone into possession and is operating such lines, and has issued and sold a large amount of stock and bonds for the purpose of carrying out its plans, a court will not annul one of the leases, and compel the restoration of the property to the

lessor, at suit of a single stockholder therein, unless a legal wrong and injury have clearly been done to him, or the corporation of which he is a stockholder.

**2.** SAME—JURISDICTION—PLEADING.

While a stockholder in a corporation may, under certain circumstances, maintain a suit in his own right against the directors to restrain them from doing an illegal or ultra vires act, yet where such act has been consummated, and by virtue thereof some third person has acquired rights, as against such person the rights of the stockholder are derivative, and not primary, and depend upon the failure and refusal of the corporation to enforce such rights in its own behalf; and he can only maintain a suit to annul the action taken in right of his corporation, and where the suit is in a federal court, by bringing himself within the requirement of equity rule 94, by showing in his bill that he has made proper efforts, without success, to secure such action as he desires on the part of the managing directors of the corporation, or, if necessary, by the stockholders, or by alleging such facts as will excuse a literal compliance with the rule, by making it appear that such efforts would have been futile.

**3.** SAME.

A suit in a federal court by a minority stockholder against his corporation and another to annul a lease of the property of the corporation to its codefendant, which has been executed by the directors with the approval of a majority of the stockholders, given at a meeting duly called for the purpose, is one in which the stockholder sues in the right of the corporation, whether the invalidity of the lease is asserted on the ground of fraud of the directors, or because it was ultra vires; and, to authorize the court to entertain such suit, the bill must contain the jurisdictional averments required by equity rule 94.

**4.** PLEADING—AMENDMENT—SUPPLYING JURISDICTIONAL AVERMENTS.

Jurisdiction must affirmatively appear at every stage of a case, and the court is without authority to permit amendments to supply essential jurisdictional averments in the bill.

**5.** CORPORATIONS—SUIT BY STOCKHOLDER.

The provision of equity rule 94, which requires a bill filed by a stockholder, founded on a right which may properly be asserted by the corporation, to "set forth with particularity the efforts of the plaintiff to secure such action as he desires on the part of the managing directors or trustees, and if necessary of the shareholders, and the cause of his failure to obtain such action," merely prescribes a rule of pleading; but the efforts of plaintiff so required to be alleged are jurisdictional unless it is both alleged and proved that they would have been futile, and where the question comes up on final hearing the evidence must be resorted to for the purpose of ascertaining whether the allegations relied upon to excuse the failure of plaintiff to apply to the directors or stockholders to bring the suit are true in point of fact.

**6.** SAME.

Plaintiffs in a suit in a federal court alleged that they became the owners, as executors, of stock in one of two corporations which were made defendants; that while such owners the directors of such corporation leased all of its property to its codefendant; that such lease was the result of fraud and conspiracy of the directors, was ultra vires, and was highly detrimental to the interests of the stockholders generally; that plaintiffs had, in a friendly manner, applied to the defendant corporations and to the directors to desist from such acts, but without effect; and the bill prayed that the lease be annulled. There was no allegation that plaintiffs had applied to the directors or stockholders to bring the suit, but it was alleged that the directors who made the lease controlled the majority of the stock. The proofs showed that the latter allegation was untrue; that the lease was confirmed by a large majority of the stockholders at a meeting duly called for the purpose, and that during the 18 months which elapsed between the making of

the lease and the bringing of the suit there had been a number of stockholders' meetings, and a new board of directors had been elected, only 5 of whom, out of 15, were directors at the time the lease was made. *Held*, that the allegations of the bill were not sufficient to excuse the failure to allege the jurisdictional fact required by equity rule 94, that plaintiffs had made efforts to secure from the directors, or, failing in that, from the stockholders, the action they desired, and the cause of their failure, nor the proofs sufficient to entitle plaintiffs to maintain the suit had such allegations been made.

7. SAME—GROUNDS FOR ANNULLING CONTRACT—FRAUD OF DIRECTORS.

The directors of a street railroad company, who owned about one-third of its stock, with the approval of a majority of the stockholders leased its property for a long term of years to another company, pursuant to a plan to unite the lines of the lessor and a competing company, together with those of the lessee, under a single management. In this plan a majority of the directors of the lessor company were interested, and after its consummation they became stockholders, and some of them directors, in the lessee company; paying for the stock, however, the same as other subscribers. The lessor company had a floating debt, besides its bonded debt, and no available funds, and had never paid a dividend. As a result of the lease, its debts were assumed by the lessee, and it was placed on a dividend-paying basis, which caused the market price of its stock to advance nearly 50 per cent. *Held*, that there was nothing in such facts to establish fraud and conspiracy on the part of the directors which would authorize a court of equity to annul the lease at suit of a minority stockholder, commenced 18 months after its execution, and after the lessee had been in control and operation of the consolidated lines, and had marketed its stock and bonds with reference to the same.

8. SAME—POWER TO LEASE PROPERTY—TRACTION COMPANIES UNDER NEW JERSEY STATUTE.

Act N. J. March 14, 1893 (Gen. Pub. Laws 1893, c. 172), authorizing the organization and providing for the regulation of traction companies, in section 16, authorizes any corporation created thereunder to lease the property and franchises of any other corporation owning or operating any street railway, subject to conditions therein prescribed. *Held*, that it also conferred power on one of two corporations organized thereunder to lease its property to the other.

9. SAME—MODE OF EXERCISING POWER.

Power given to a corporation by its charter, or by the general act under which it is incorporated, to lease its property and franchises, enters into the agreement between its stockholders; and, where no particular mode of exercising such power is prescribed, it may be exercised in the same manner as other general powers of the corporation,—by the vote of a majority of the stockholders, or by the board of directors.

10. SAME—RIGHTS OF MINORITY STOCKHOLDER.

Where a corporation is authorized by the law under which it is created to lease all of its property and franchises, the making of such a lease does not deprive a dissenting stockholder of his property without due process of law, since the exercise of such power by a majority was one of the implied conditions under which he became a stockholder.

11. SAME—NEW JERSEY STATUTE.

Act N. J. March 14, 1893 (Gen. Pub. Laws 1893, c. 172), after authorizing traction companies organized thereunder to lease the property and franchises of any other street railway company, provides, in section 17, that any stockholder in a company which shall so lease its property who objects to such action may institute a proceeding in court, in which his damages shall be appraised, and also the value of his stock, and that the lessor company shall either purchase his stock at the appraised value, or pay the damages assessed. *Held*, that such provision is not invalid as against a stockholder in a corporation organized under the act, who

took his stock subject to such condition, as authorizing a condemnation of his property under the power of eminent domain for private use, but that it is valid, as providing an additional remedy for his benefit, of which he may avail himself, or not, at his option.

In Equity. Suit by stockholders to annul a lease made by the corporation.

Joseph A. Duffy and Charles J. Roe, for complainants.
Coult & Howell and Spencer Weart, for defendants.

GRAY, Circuit Judge. The bill in this case was filed December 28, 1899, by the complainants, both citizens and residents of the state of Maryland, as executors of Samuel T. Dickinson, deceased, a citizen of New York, who died October 9, 1896, appointing the complainants his executors by his last will probated in the state of New York. The bill and answer, as summarized in complainants' brief, are as follows:

The defendants are corporations of New Jersey and citizens of the states of New Jersey, New York and Pennsylvania, all of whom have answered. The bill alleges that the complainants are the owners as executors of 100 shares of the capital stock of the Consolidated Traction Company, which came in their hands as assets of the estate of their testator. That the Consolidated Traction Company was incorporated on March 15, 1893, under an act of the legislature of New Jersey, particularly set forth in the said bill of complaint. That on September 25, 1893, the Consolidated Traction Company leased the property and franchises of the Jersey City and Bergen Railroad Company, a special corporation of New Jersey. (Schedule B.) That on January 2, 1894, the Consolidated Traction Company leased the New Jersey Traction Company, a corporation organized under the act concerning corporations. (Schedule C.) That they also became possessed of the capital stock of a ferry line. (Schedule A.) That they thereby became the owners of very valuable franchises, which were continually increasing in value and in financial returns. That on June 12, 1894, the North Jersey Street Railway Company was incorporated under the same act under which the Consolidated Traction Company was incorporated. That prior to the lease hereinafter mentioned, the North Jersey Street Railway Company was a small company, having but little property and few franchises. The bill further sets forth the directors of the Consolidated Traction Company and the North Jersey Street Railway Company on March 1, 1898, and also the directors of the Consolidated Traction Company on March 22, 1898, and the directors of the North Jersey Street Railway Company on June 26, 1898, and the directors of both companies on November 1, 1899, all of whom are made defendants. That in the month of March, 1898, the directors of the Consolidated Traction Company, to wit:—Edward F. C. Young, John D. Crimmins, P. A. B. Widener, A. J. Cassatt, Jeremiah O'Rourke, Thomas F. Ryan, A. Q. Garretson, William L. Elkins, Elisha B. Gaddis, Thomas Dolan, Almeric H. Paget, David Young, J. Roosevelt Shanley, C. A. Griscom, and George F. Perkins, controlling the majority of the capital stock of said company, knowing the value of its franchises and property and the increasing income of the same, for the purpose of benefiting themselves personally and di-

verting the same from the stockholders at large, combined with Bernard M. Shanley and the directors of the North Jersey Street Railway Company, to wit, James J. Corbiere, Wilber S. Johnson, Dudley Farrand, Halsey Barrett, John J. Kehoe, John E. McArthur, William J. Davis, John W. Omberson, James E. Hulshizer, Jr., and Henry M. Doremus, who were agents of the directors of the Consolidated Traction Company, to transfer by means of lease, the Consolidated Traction Company to the North Jersey Street Railway Company. That in pursuance of such scheme, on May 25, 1898, the Consolidated Traction Company executed a lease of its property and franchises to the North Jersey Street Railway Company for 999 years; which lease is appended to and made part of the bill. That the complainants had no notice of this transaction. That the money by which this scheme was carried out was furnished by the proceeds of the sale of $6,500,000 of bonds secured by a mortgage issued by the North Jersey Street Railway Company, the security for which was principally the property and franchises of the Consolidated Traction Company, and the money necessary to pay the interest and the redemption of such bonds arising from the earnings of the Consolidated Traction Company. That Bernard M. Shanley, through whom the transaction was brought about, was made president of the Consolidated Traction Company, and by the terms of the lease was given $10,000 a year. The bill further alleges that the said lease is invalid, unconstitutional and void, and charges fraud and breach of trust on the part of the directors of the Consolidated Traction Company. That application was made to the defendants to redress the wrong, which was refused. And praying that the lease may be set aside and declared null and void, and the property of the Consolidated Traction Company be restored to its stockholders, and that the North Jersey Street Railway Company account for the profits derived from the operation of the franchises and property of the Consolidated Traction Company.

The answer filed by the defendants admits the leasing and the organization of the companies, and states the constituent formation of the Consolidated Traction Company. It denies that the directors had any interest in the North Jersey Street Railway Company, directly or indirectly. And says that the stock of the North Jersey Street Railway Company was lawfully issued for a valid consideration paid to the company, and denies the right of complainants to question the same. That the Consolidated Traction Company employed its entire stock of $15,000,000 and had issued its entire bonds of $15,000,000. That on March 28, 1898, it was further indebted to a list of persons in amounts there given, amounting to $1,007,128.78. That it was in receipt of a large income from traffic, but that additional expenses necessary for extension and general development of the system had exhausted its funds, and the legal limit of its capacity to borrow money had been reached, and some immediate relief had to be had. That the Newark & South Orange Railway Company was a competitor with the Consolidated Traction Company in the railway business in the county of Essex, which company was operated independently and not controlled by the Consolidated Traction Company or individuals composing its board of directors. That the North Jersey Street Railway Company

was another competitor, and on March 28, 1898, had an authorized capital of $5,000,000, of which only $325,400 was subscribed. That in the month of April, 1898, its capital was increased to $15,000,000, with authority to issue $15,000,000 of bonds; setting forth its directors. That prior to March 28, 1898, a proposition was made by the North Jersey Street Railway Company, through its president, to lease the franchises and leaseholds of the Consolidated Traction Company for 999 years, naming the directors of the Consolidated Traction Company. That the proposition was submitted by and under a resolution of the board of directors of the Consolidated Traction Company, on March 28, 1898, to the stockholders; that notice was sent to Samuel T. Dickinson, the complainants' testator, at 239 Washington street, Jersey City, where in his lifetime and at the time of becoming owner of the 100 shares of said company's stock he had an office, and also the date of the meeting advertised in a Jersey City newspaper. That at the stockholders' meeting, 108,333 of shares in interest voted in favor of making the lease, and 26,132 shares in interest voted against the same. That the minority stockholders were led by John D. Crimmins, one of the directors of said corporation, who afterwards assented to said lease. That by virtue thereof the North Jersey Street Railway Company took possession on June 1, 1898, of the property and franchises of the Consolidated Traction Company, and have been operating the same since.

The answer denies fraud or conspiracy, or that any of the directors of the Consolidated Traction Company were interested in a single share of the stock of the North Jersey Street Railway Company, or that the board of directors were the largest stockholders of the Consolidated Traction Company. And says that early in 1898 the board of directors of the North Jersey Street Railway Company, by their agents, with the avowed purpose of placing the control of all of said railway systems under one head, began negotiations to purchase the capital stock of the Newark & South Orange Railway Company, and that such proceedings were had in relation thereto that eventually, as part of said plan, the North Jersey Street Railway Company became the owner of all the capital stock of the Newark & South Orange Railway Company, for which it paid the sum of $1,500,000; that it took up the bond issue of $1,525,000 of that road and paid off the floating debt, amounting to $235,000, and paying upwards of $3,250,000 in cash therefor from the money that was realized from the sale of the bonds and stock of the North Jersey Street Railway Company; and that the transaction was completed so that the North Jersey Street Railway Company took possession of the property and franchises of the Newark & South Orange Railway Company on May 25, 1898, six days prior to the time when the North Jersey Street Railway Company took possession of the property and franchises of the Consolidated Traction Company. And charges that the complainants had knowledge of the intention of the North Jersey Street Railway Company to purchase the stock of the Newark & South Orange Railway Company, and that they knew when the same had been purchased, and that the purchase was part of the general plan conceived by the North Jersey Street Railway

Company for placing the operation and control of all of said railway lines under one management; and that all the stockholders, except the complainants have acquiesced and tacitly consented. They admit that the complainants personally, or by attorney, came to the office of the Consolidated Traction Company in the beginning of the year 1899, and that the treasurer and counsel of the company explained to them fully the conditions of the lease, and exhibited to them fully the manner in which it had been authorized and executed, and stated to them briefly the reason why the lease had been entered into, and gave them full information as to their rights as stockholders, etc.; that the complainants expressed dissatisfaction and claimed that the legislature could not pass a law authorizing the lease. That they had been subject to expenses and disbursements by reason of the lease, and that the stock of the Consolidated Traction Company had risen in value. That the original intention on the part of the officers, directors and stockholders of the said three corporations in uniting their roads under one management, was to operate them in a more economical manner and with greater satisfaction to the large number of people who daily became passengers thereon. That it would be inequitable and unjust to set aside said lease and interfere with the business of the North Jersey Street Railway Company, and take from its stockholders and bondholders a large part of the consideration upon which the value of their stock and bonds depend.

An amendment was allowed by the court to be filed to the bill, covering certain alleged specifications of fraud that complainants claimed to have discovered in the taking of the testimony. Upon the issues thus framed, testimony was taken on both sides, and the contentions on the part of the complainants are: First. That such fraud has been shown on the part of the directors of the Consolidated Traction Company as vitiates the whole transaction of the lease. Second. That the lease of the Consolidated Traction Company was an illegal, as well as an ultra vires, act on the part of the defendants. Third. That the lease in question, in its effect, takes the private property of the complainants, against their assent, and is in violation of the rights of complainants, guarantied to them by the constitution of the United States. Their bill, therefore, prays that the defendants, and each of them, may be restrained from carrying on the business of the Consolidated Traction Company, under the lease to the North Jersey Street Railway Company; and that the said executed indenture of lease may be set aside and declared null and void; and that the property of the Consolidated Traction Company may be restored to it and to the stockholders thereof; and that the North Jersey Street Railway Company may desist from operating the railways of the Consolidated Traction Company; and may account for the profits derived by it from the operation of the street railway lines, franchises and other property of the Consolidated Traction Company, of which it obtained possession by virtue of said indenture of lease; that the North Jersey Street Railway Company may desist from paying any sums of money to the Consolidated Traction Company in accordance with the terms set forth in said in-

denture of lease, and that the Consolidated Traction Company may desist and refrain from accepting the same, and that the Consolidated Traction Company, or its directors, and the North Jersey Street Railway Company, or its directors, may desist and refrain from making any other agreement, contract, lease or other arrangement to take from the Consolidated Traction Company its property, franchises and business.

It thus appears that the end sought by these complainants, as holders, in their representative capacity as executors of their decedent's estate, of 100 shares of stock of the Consolidated Traction Company, is no less than the setting aside and nullification of an executed transaction of lease between the two corporations defendant, under and by means of which an important railway property has been bought and controlled by the lessee company, $6,000,000 of its bonds marketed, $15,000,000 of stock issued, and an extended railway system made possible, and operated for a period of more than 18 months prior to the filing of the bill in this case. Consequences that will involve the destruction of present conditions of comfort and convenience to a large community, and the demoralization of settled plans for the administration of large and valuable properties, with possible serious resulting loss to the stockholders of the defendant companies, ought not to be lightly incurred. That a wrong and injury has been done by the transactions complained of, to the estate of the single decedent stockholder, whose executors are complainants, in this case, or to the corporation of which he was a member, should be made clearly manifest before the asked for interference of this court should be granted. But though it is true that no pecuniary loss or damage has been shown to have resulted to the holders of these 100 shares of stock, by reason of these transactions, we must nevertheless consider whether a legal or technical wrong has been done them by reason of some contravention of their legal rights as stockholders, or to the corporation itself, by reason of the illegal action or the fraudulent mismanagement of its interests, by those who for the time being controlled it.

In the present case, the alleged fraudulent acts of the directors of the Consolidated Traction Company, as well as the invalidity and ultra vires character of the lease complained of, were wrongs, not against the complainants as individual stockholders, but against the corporation, for which it would be entitled to be the complainant in a suit such as this, and it is only because of its failure to seek a remedy for these alleged wrongs, by suit, that a minority stockholder is permitted to carry the flag of the corporation, and under that flag fight the battle that the corporation ought to fight. Though the corporation is brought into court as a defendant, its real status is that of a plaintiff, and the relief sought must be such as will inure to its benefit. A stockholder who has grounds to believe that his directors are about to do an illegal act or thing, in order to restrain them therefrom, need not necessarily invoke the jurisdiction above referred to, because the thing complained of being in fieri, his individual interests in relation thereto may, under certain circumstances, be such, that he is not compelled to deal with the corporation itself,

but may proceed in his own name directly against the individual directors, to obtain relief for the wrong being perpetrated against him. But when the act complained of is not in fieri, but is consummated, and by virtue thereof some third person has acquired rights, then, as against that third person, the act of his corporation having been consummated, the stockholder's right to ask for a decree is derivative and not primary. A stockholder of a corporation cannot, by simply averring—"I am a stockholder of the corporation, and that corporation has made a contract which is illegal or improper, with another corporation"—ask that it shall be decreed against that other corporation, that the contract is illegal or improper, and that it shall surrender whatever it has taken under it. The case is one of corporation against corporation, and but for the equity principle above alluded to, and to be hereafter more fully referred to, there would be no relief whatever, because the third person (the other corporation) would say to the complaining stockholder, "You are not a party in any way to this case; you are only a stockholder; your corporation must sue me." But, although the stockholder as an individual can never go into a court of equity, and ask for relief against a third person, upon the ground that the corporation has made a bad bargain, whether by the fraudulent or the illegal action of its directorate, yet, if the corporation ought to bring a suit against such third person, and seek, as against him, to take back property, and if the corporation refuses so to do, the minority stockholder may, in equity, be permitted to assert the right which the corporation ought to assert, by alleging that the corporation so refuses to act, after he has made honest and bona fide efforts to induce them to do so, and by making his corporation a party by bringing it in as a defendant, though its real status is that of plaintiff, and seek to obtain for it the relief to which it would have been entitled, had it itself sued.

It has long been recognized as a principle in courts of equity, that a stockholder may enforce a right belonging to the corporation of which he is a member, or obtain relief for a wrong inflicted upon it, and for which the corporation itself might have maintained a suit, where he makes it appear to the satisfaction of the court that he has honestly endeavored to induce those in control of the corporation to bring such suit, and that he has failed in such endeavor, by setting forth the particulars of his efforts and the reasons for his failure. The inconveniences that would result from the interference of individual stockholders, where these preliminary efforts were not made, are so apparent, that the supreme court of the United States has guarded against them, by the peremptory requirements of a rule, that the bill in such cases must be under oath and contain allegations of the jurisdictional facts above stated. This is the well-known ninety-fourth rule in equity, which also embraces another requirement, which, owing to the peculiar jurisdiction of the circuit courts of the United States, had pressed itself upon the attention of these courts. This matter was the prevalence of collusive practices for the purpose of creating the conditions of federal jurisdiction, by diverse citizenship in the said courts. Accordingly, the ninety-fourth

equity rule was promulgated at the October term, 1891, and is as follows:

"Every bill brought by one or more stockholders in a corporation against a corporation and other parties founded on a right which may properly be asserted by the corporation, must be verified by oath, and must contain an allegation that the plaintiff was a shareholder at the time of the transaction of which he complains, or that his share devolved on him since by operation of law, and that the suit is not a collusive one to confer on a court of the United States jurisdiction of a case of which it would not otherwise have cognizance. It must also set forth with particularity the efforts of the plaintiff to secure such action as he desires on the part of the managing directors or trustees, and if necessary of the shareholders, and the cause of his failure to obtain such action."

There are no allegations in the bill, as filed, complying with the requirements of this rule. The complainants, however, contend that they are within certain recognized exceptions to the rule. These exceptional conditions which are said to excuse a literal compliance with the rule, are consistent with the reasons that support equitable jurisdiction in such cases. If it is apparent in a case like the present, that the directors, who are alleged to have offended, are still in control of the corporation, and so implicated in the alleged wrongdoing as to make it certain that a demand upon them to right such wrong or to bring suit for that purpose would be an idle ceremony, it would be unreasonable to require such demand to be made. Suits by one or more stockholders of a corporation, to assert a right belonging to the corporation, or remedy a wrong committed against it, where the corporation itself is powerless to act by reason of the refusal of those having management and control of it, had been recognized as cognizable in equity long before the promulgation of the rule referred to. The development of this equitable jurisdiction in England and America, is set forth in the judgment of the supreme court, in Hawes v. City of Oakland, 104 U. S. 450, 26 L. Ed. 827. Mr. Justice Miller, in delivering the opinion in that case, thus describes and defines this jurisdiction:

"But, in addition to the existence of grievances which call for this kind of relief, it is equally important that before the shareholder is permitted in his own name to institute and conduct a litigation which usually belongs to the corporation, he should show to the satisfaction of the court that he has exhausted all the means within his reach to obtain, within the corporation itself, the redress of his grievances, or action in conformity to his wishes. He must make an earnest, not a simulated effort, with the managing body of the corporation, to induce remedial action on their part, and this must be made apparent to the court. If time permits or has permitted, he must show, if he fails with the directors, that he has made an honest effort to obtain action by the stockholders as a body, in the matter of which he complains And he must show a case, if this is not done, where it could not be done, or ᴛ was not reasonable to require it."

Such being the grounds of the jurisdiction, the court proceed to say that, like other jurisdictional facts, they should be alleged in the bill. In addition to this foundation of equitable jurisdiction, common to both English and American jurisprudence, the supreme court, owing to the exceptional and limited character of federal jurisdiction depending upon diverse citizenship, added in the rule another requirement, that in all such cases, the bill of complaint thus

sworn to, should contain an allegation negativing collusion practiced for the purpose of creating the diverse citizenship necessary to jurisdiction in a federal court. At the same term at which this judgment was delivered, the ninety-fourth rule, as above quoted, was promulgated. This rule, of course, did not and could not create the jurisdiction, the exercise of which it thus properly undertakes to regulate. The essential jurisdictional facts are prescribed by the settled equitable doctrines above referred to, and by the constitutional requirement of a bona fide diverse citizenship. The manner in which the jurisdiction may be invoked in the federal courts, is prescribed by the said rule.

The defendants contend that the complainants have not complied with the ninety-fourth rule in any of its requirements. They say that the bill makes no allegations whatever in regard to these vital and important jurisdictional facts. It is not denied by complainants that there is no allegation in the bill, as filed, "that the suit is not a collusive one to confer on a court of the United States jurisdiction of a case of which it would not otherwise have cognizance," and that in this respect, they have failed to comply with the rule. This rule is binding upon this court, and it is without authority to entertain a suit in equity, wherein the bill of complaint is lacking as to any of its requirements. Complainants, however, after the taking of testimony on both sides had been concluded, or was about to conclude, asked that they be allowed to amend their bill by inserting the allegation, that the suit was not a collusive one, in the respects and in the form prescribed by the rule. And they contend that this amendment should be allowed at any time, inasmuch as they allege that the defect in the bill, which it was designed to cure, was a technical and formal one. We think, however, that the defect is not merely technical or formal. It is jurisdictional. It was within the power of the supreme court to require by rule that essential jurisdictional facts should appear by averment in the bill of complaint, that the bill should be sworn to, and that the right of the circuit court to entertain the suit should be conditioned upon the presence of such averments. An allegation in the bill under oath, that there is no collusion, is a condition precedent to the jurisdiction of this court over the case. This court cannot permit a bill to be amended in a case, over which it has no jurisdiction. Jurisdiction must affirmatively appear at every stage of the case. It can be questioned in any mode and at any time, and does not require to be formally objected to by plea or demurrer. The court may, of its own motion, note the want of jurisdiction and dismiss the bill. In this case, however, objection to the jurisdiction on the ground stated was made in the answer of defendants as if on demurrer.

But passing over the question as to the right to amend, in the manner proposed, and assuming for the present that such an amendment could be allowed, we come to the objections by complainants, that this suit is not founded on rights which the corporation against whom the suit is brought, and of which complainants are stockholders, could properly assert, and therefore not within equity rule 94. We think, however, that by an examination of the allegations of

the bill, and the prayers for relief, it will abundantly appear that the jurisdiction in this case, must rest primarily upon the equitable doctrine, that permits a minority stockholder to assert a right or pursue a remedy, belonging to the corporation of which he is a member, and which it has declined to assert or pursue in its own behalf upon due demand from such stockholder, or where the circumstances are such as to make it clear that such demand would be idle. The thing complained of is a lease of its property and franchises, made by the corporation of which complainants are stockholders to another corporation through the action of its board of directors, confirmed by the stockholders as a body, at a regularly called annual meeting, with notice that the matter of such lease was to be considered. This lease, it is charged by complainants, was made by a board of directors, who controlled a majority of the capital stock of the said corporation, and who, for their own selfish purposes, are alleged to have entered into a conspiracy among themselves and with the directors of the North Jersey Street Railway Company, which company and its directors, as well as the directors of the lessor company, are made defendants in this suit. It is also charged that the lease so made by the directors, and sanctioned by the majority of the stockholders, was ultra vires, and therefore illegal and invalid. The fraud here charged against the directors was not in fieri, but a fact accomplished, and was clearly practiced against, and an injury to, the corporation and to the whole body of the stockholders as a corporate entity, and it belonged to such corporate entity, to assert the right to redress against such delinquent directors, and against the lessee corporation, if it had participated in the fraud. No right accrued to a single stockholder, or any number of stockholders, as individuals, primarily to sue in their own names, because whatever injury resulted to them as individuals, is indirect and derivative. This is true also as to the charge, that the lease in question was ultra vires. It belonged primarily to the corporation to assert the right to have it set aside. If, however, the corporation, through its directorate, or its stockholders as a body in lawful meeting assembled, refused to assert these corporate rights, due demand having been made that they should do so by one or more stockholders, or circumstances having been shown from which it clearly appears that such demand could not be made in time, or, if made, would have been certainly futile, then, out of these facts arises a distinct equity in such stockholder or stockholders to institute, in behalf of the corporation, the suit which said corporation ought to have instituted, and seek before a chancellor for the relief to which such corporation would be entitled, if it had brought suit in its own name. The relief sought must inure to the benefit of the corporation, which is made defendant for the purpose of bringing it into court, where, as we have said, it really stands in the attitude of a plaintiff. The equity which permits the bringing of such a suit by a stockholder, is as distinct and well defined as any other head of equity jurisdiction. It depends upon and arises from the facts above recited, and if these do not all appear as concurring, to the satisfaction of the chancellor, his jurisdiction fails for want of the equity to support it. The ninety-fourth

rule merely requires that these necessary jurisdictional facts must be alleged under oath, as a matter of pleading, as well as be shown to exist. If they fail to be so alleged under the requirements of the rule, there is no jurisdiction in the court to proceed, and the bill must be dismissed. Likewise, the requisite allegations being made, they must be supported by proof, and if they fail to be so supported, jurisdiction fails for want of the peculiar equity, as above defined, to sustain it, and for that reason, the bill must be dismissed.

Being of opinion that this suit is founded upon rights which the corporation, against whom the suit is brought, could and should properly assert, we are brought to the consideration of the important question, whether, first, this suit develops the fact that equity rule 94, in other respects than those requiring a denial of collusion, has been complied with, and second, whether, if the allegations required by the rule have been made, they have been supported by the evidence in the case. These allegations, it must be remembered, refer to essential jurisdictional facts, out of which alone the equity that will support this bill can arise. They must both be alleged and proved. Passing over again the question of the right of complainants to amend their bill at the time they offered to do so, in order to supply the admitted absence of any allegation therein respecting collusion, which has to do only with the conditions necessary to the peculiar jurisdiction of federal courts, and not with those necessary to their jurisdiction as courts of equity, we turn to the contention by complainants, that, in other respects, equity rule 94 has been complied with.

An inspection of the bill shows that it has been verified by affidavits of both the complainants; that it contains an allegation that the complainants were shareholders of the Consolidated Traction Company; that the shares devolved upon them as personal representatives of a decedent, who owned these shares at the time of his death, and that they were shareholders at the time of the grievances complained of. In these respects, the allegations complied with the requirements of the rule. The bill contains, however, no allegation which "sets forth with particularity the efforts of the plaintiff to secure such action as he desires on the part of the managing directors or trustees, or, if necessary, of the shareholders, nor the cause of his failure to obtain such action." Manifestly, the allegation in the bill, that complainants had frequently and in a friendly manner applied to the said corporations defendant, and to all the other individual defendants, and had "endeavored to persuade them to desist in their unlawful and unjust conspiring against your orators and their violating law," etc., does not meet the requirements of the rule; that requirement being a setting forth in the bill of the efforts by complainants to induce the managing directors, or the body of stockholders, to bring the suit which they now seek to institute, and the reason of the failure of such efforts to induce the directors or body of stockholders so to do. As we have seen, it is on this important and essential fact, that the equity of an individual stockholder or stockholders, to maintain a suit in behalf of the corporation, is founded, and the jurisdiction of this court depends. But as, in considering whether such efforts have in fact

been made, their absence can be excused by showing exceptional circumstances which prevented their being made in time, or that the conditions were such as made it manifest that if such efforts had been made, they would have been futile, so, in considering the requirements of the rule, that there should be an allegation under oath that such efforts had been made, courts have, in a number of cases, said that, where the general allegations of the bill were such as to make it manifest that, if true, such application to the directors or stockholders would have been without avail, the necessity for such allegation would be dispensed with. No general rule can be laid down to guide us, as to when the general allegations of a bill make such a showing, as will dispense with this particular allegation as to efforts on the part of the complainants, to induce directors or the body of stockholders, to redress the wrong alleged to have been committed against the corporation. Each case must stand upon its own facts and circumstances. The rule is a peremptory one, that the fact that such application, if made, would be futile, must absolutely and clearly appear, and so, if the question comes up at final hearing, the evidence in the case must be resorted to, to show that the allegations of the bill relied upon for this purpose, are true in point of fact. And especially is this so, when we reflect that the fact of application to the directors, or circumstances excusing the want of such application, are jurisdictional facts, the failure of which to appear in the testimony, negatives the equity of the complainant stockholders for the relief prayed for.

An examination of the testimony in this case, discloses the fact that the board of directors of the Consolidated Traction Company, who negotiated and executed the lease, was not the board of directors of said company at the time the suit was brought, and had not been for many months previous thereto. Of 15 directors constituting the board at the time of the lease, only 5 were members at the time of the bringing of this suit. It is true, that some or all of the remainder were members of the board of directors of the North Jersey Railway Company, but they were engaged then in a transaction not alleged to be in itself illegal, and must have viewed the whole situation from the standpoint of their own company, the lessee. But, as directors of the lessor company, they were not committed in any way to make it unnatural or self-stultifying, if they should inquire whether the former board of directors of the lessor company had transcended their powers or committed a fraud. Nothing is shown which would have prevented an application to the new board of directors, asking them to take steps to redress these alleged wrongs to the corporation. That a refusal on their part was probable, ought not to excuse the lack of such an application. Some explanation of the situation might have been given, that would have been satisfactory to these complainants. But the rule further requires that, if necessary, application should be made to the shareholders for the same purpose. This was not done, and nothing in the evidence, or in the allegations of the bill, appears to excuse the want of such an application. The allegation that the directors controlled a majority of the capital stock of the Consolidated Traction Company, appears from the evidence to be untrue. The shareholders, as a body, are not accused of fraudulent or improper

conduct, in regard to this lease, and though the grea⁺ majority voted for its confirmation, it does not lie in the mouths of these complainants, in considering the requirements of this rule, to say what might or might not have been the result of an application made to a regular and lawful meeting of the body of shareholders. Nothing appears in the allegations of the bill, or the evidence produced in the record, that would reasonably prevent the shareholders from being convinced, notwithstanding their previous vote for confirmation of the lease, that the same was a fraud upon the corporation of which they were members, and upon themselves as stockholders. On the contrary, it is presumable, that, if the allegations of the complainants, as to the ruin wrought by the lease, and to be hereafter wrought by a continuance thereof, are true, that fact could be made to appear to the fellow stockholders of the complainants, and in that case, the ordinary motives governing human conduct, would excite them to co-operation with the complainants.

The contention made by complainants that, those of the stockholders who subscribed to the bonds of the North Jersey Street Railway Company, were bribed by the reception of an allotment of shares of stock of that company, with each bond subscribed for, cannot be sustained. The subscription to their bonds was open, and on the same terms to all, whether stockholders of the Consolidated Traction Company, or not. These complainants had the same right and opportunity to subscribe and receive the bonus stock, as the other stockholders. It is not and cannot be truly alleged that such stockholders could not, with perfect propriety, subscribe to these bonds, just as others, not stockholders, could do. They owed no duty to the corporation of which they were members, or to their fellow stockholders, which would forbid their so doing; nor is there any evidence to connect the great body of stockholders, other than those in the direction, with the alleged conspiracy of the directors denounced in the bill.

During the more than 18 months that elapsed between the execution of the lease and the bringing of suit, more than one regular meeting of stockholders was held, at any of which it would have been possible for these complainants, to have stated their grievances, and asked for such action as was competent for the stockholders as a body to take. If complainants believed the allegation of their bill, that the lease complained of, was the result of the machinations of the directors of the Consolidated Traction Company, practiced for the selfish purpose of diverting an enormous income, that was about to come into the treasury of the said company for the benefit of the stockholders, and appropriate the same to themselves personally, and that, as is alleged in their brief, the making of said lease in the manner and upon the terms set forth, completely wrecked the said Consolidated Traction Company, and that the cancellation of said lease, and the undoing of the transactions connected therewith, would restore these enormous profits, and put them in a position in which they could reasonably expect them to be increased for the future, it is hard to imagine why they should not reasonably hope to so impress their fellow stockholders, by an appeal to their selfish interests, as to gain their co-operation in compelling the corporation to

assert the rights, which in this suit the complainants seek to assert in its behalf.

We think, therefore, that the allegations of the bill (relied upon by the complainants for that purpose) are not sufficient to dispense with the allegations of the jurisdictional fact as required by the ninety-fourth rule, that complainants had made efforts (setting forth with particularity what those efforts were) to secure from the managing directors, or, failing in that, from the shareholders, such action as they desired, and the cause of their failure to obtain such action. But if such allegations in the bill had been sufficient as allegations, they cannot, when at this stage of the case they have been shown from the testimony to be untrue in essential particulars, be relied upon for the purpose of dispensing with the requirements of the rule. And this brings us again to say, without regard to the question of whether the allegations of the bill conform to the requirements of the rule, that the essential facts required by said rule to be alleged under oath, are jurisdictional facts, and if they fail to be proved, whether alleged or not, the foundation for that peculiar equity which this suit is instituted to assert, fails, and this court is without jurisdiction to give the relief sought. To this conclusion we have come, because, as we have just said in another connection, there is nothing in the case as developed by the evidence, which will, as a matter of fact, justify the admitted neglect of the complainants to make any application to the new board of directors, to institute a suit on behalf of the corporation for such redress as is sought by these complainants in the present suit.

But if the facts necessary to support the equitable jurisdiction of this court had appeared, we are of opinion that complainants have failed to substantiate either of the grounds upon which they rely for relief. A careful examination of the testimony in this regard, fails to disclose the fraudulent and improper conduct on the part of the directors of the two defendant companies, charged in the bill. Bernard M. Shanley, who is made a defendant, and charged with being a leading co-conspirator with the other defendants, seems to have been, what in modern parlance is called, a promoter of large schemes for the combination of rival corporations under one management, so as to achieve for all concerned the benefits of more economical administration and increased facilities for earning profits. It appears, also, that the Newark & South Orange Railway Company was a company competing with the Consolidated Traction Company, in Newark, and also in a large stretch of suburban country. The desirability of the Consolidated Traction Company obtaining control of this competitor, had been manifest for a long time prior to the transactions here in question. But the Consolidated Traction Company had a large floating debt, and had exhausted its capacity for borrowing money. It seems to have occurred, probably first to Shanley, but possibly to the executive officers of the defendant the North Jersey Street Railway Company, as possibly also to the executive officers of the Consolidated Traction Company, that the former company might be so reorganized as to make it a valuable instrument for consolidating the railway interests of the Consolidated

Traction Company, the Newark & South Orange Railway Company, and those already controlled or capable of being controlled by the said North Jersey Street Railway Company. This latter company had been doing business in a small way, on a small capital, and needed a reorganization to make it capable of accomplishing this design. It had authority, or it was known that authority could be conferred upon it, to issue $15,000,000 in par value of the stock, and $15,000,000 of bonds. It was an independent corporation, although a small one, and none of its directors were directors in the Consolidated Traction Company. Shortly prior to the transactions here in controversy, Shanley became a subscriber to a syndicate formed to develop this North Jersey Street Railway Company, with a view to provide the money to pay off the floating debt of the Consolidated Traction Company, and purchase the Newark & South Orange Railway Company. With this end in view, he seems to have determined, with advances made by himself and others who might join with him, to provide the North Jersey Street Railway Company with sufficient cash to start the project proposed. John F. Dryden, a citizen of the state of New Jersey, of large means and high character and standing, was selected to receive subscriptions of cash for that purpose. $354,000 was deposited in Mr. Dryden's hands, by 32 subscribers, for this purpose, of which $117,000 was subscribed by 10 of the directors of the Consolidated Traction Company. These amounts were afterwards credited on account of subscriptions to the bonds and stock of the North Jersey Street Railway Company. A movement was then started by Shanley, and his associates, to provide money to pay off the floating debt of the Consolidated Traction Company, and purchase the Newark & South Orange Railway Company. In the carrying out of this plan, Shanley seems to have acquired, or obtained an option upon, all the securities of the Newark & South Orange Railway Company, and the Suburban Traction Company, which he placed in the custody of one L. D. Howard Gilmore, as his agent. Gilmore then, as the actual and legal custodian of these securities, made a proposition to sell the same and pay $2,400,000 in cash, for $6,500,000 of bonds, and $14,659,400 par value of stock of the North Jersey Street Railway Company. The company accepted the proposition, and Mr. Shanley, in behalf of the North Jersey Street Railway Company, proceeded to obtain the money for the project, by selling its bonds, giving a $1,000 4 per cent. bond, and $2,000 of par value of stock of the North Jersey Street Railway Company, for $1,000 in cash. With the money thus obtained, the floating debts of the Consolidated Traction Company and of the Newark & South Orange Railway Company were paid off, and being thus in control of these valuable competing properties, so long desired by those in control of the Consolidated Traction Company, a proposition was made to the latter company, that it should lease its property, franchises and privileges to the North Jersey Street Railway Company for a period of 999 years, the latter company assuming its liabilities and agreeing to pay to the lessor company the sum of $1,000,000 upon the execution of the lease, and a rent thereafter to be paid annually, amounting to $300,000 for the first two years, and increasing at intervals

until 1906, when and thereafter, the annual rent should be $600,000. No dividend had ever been theretofore paid upon the stock of the Consolidated Traction Company. The proposition was accepted, and the lease executed, with the result that the stock of the Consolidated Traction Company rose in the market nearly 50 per cent Before, however, the project was actually accepted by the directors of the Consolidated Traction Company, or the lease executed, the question of its advisability was submitted to a meeting of the stockholders of the company. The meeting was a regular annual meeting, but, in the call for the same, notice was given that the project of this lease would be brought before the meeting for consideration. After full explanation, it was confirmed, and approved by the stockholders, 108,000 shares out of 150,000 voting in favor thereof, and 23,000 against. These 23,000 afterwards, by written assent, were recorded in favor of the lease, and finally all but 400 shares, 100 being in the hands of the complainants in the present suit, had, in one way or another, assented to the transaction. The remainder of the $15,-000,000 of bonds had been marketed, and were widely distributed, as also the stock of the North Jersey Street Railway Company, and for 18 months prior to the suit, and for nearly 2 years since, the properties leased and controlled by the North Jersey Street Railway Company have been administered without complaint, so far as the record shows, on the part of any other stockholders than those representing the 400 shares mentioned. Much is made of the fact that Mr. Dryden was a secret trustee for the receiving of the cash subscriptions necessary to start the project, but there seems to have been no special injunction of secrecy, and what was done was known to a large number of interested persons. It was part of a plan that seems to have been well calculated to achieve an object that was conceived to be by both directors and stockholders of the Consolidated Traction Company a desirable one to achieve. It is altogether probable that this scheme was known to the directors of the Consolidated Traction Company. They were all of them large holders of the stock of that company, although they did not control the same, as alleged by the complainants in their bill; fully two-thirds of it being in other hands. But whatever the proportion of their holdings may have been, it was large enough to give these directors a personal interest in the successful management and prosperity of the corporation they were managing. Their subscription to the stock of the North Jersey Street Railway Company was consistent with this personal interest, and did not place them in the position of antagonism to the interests of their own corporation, a thing abhorred by equity, where trustees are personally benefited by the thing done by them as trustees, except in so far as they are benefited, in common with all other stockholders, by wise business management. Shanley was a director in neither company, but was a large holder of the stock of the Consolidated Traction Company, and certainly could have had no interest in wrecking that company. What his profits were as a promoter of the scheme, does not clearly appear. They were probably large, but the transaction was one requiring experience as a financier, skill and large pecuniary means. At all

events, there is nothing in the record to show that the directors shared in the profits accruing to Shanley as a promoter, or received any benefit from him, other than what came to all the stockholders from what was accomplished by his efforts. The lease, so far as the evidence before us goes, approved itself to the judgment of all the stockholders, except those interested in this suit, and it seems to have redounded to the well-being and prosperity of the enterprise in which their capital was embarked, by placing it upon a dividend-paying basis, where it had never before been. It likewise seems to have given to the public a better organized and more extended service. That the lessee company is controlled by many or most of the same men who, before the lease, controlled the Consolidated Traction Company, would seem to be to the advantage of the stockholders of that company, and not to their detriment. This state of things as disclosed by the record, is very far from sustaining the allegations of fraud against the individual defendants in this case, directors in the two companies, or any of them, and nothing but the clearest proof of such fraud would justify the interference asked of this court on that ground.

We now turn to what seems, from the argument of the complainants, the principal ground upon which they rest their case. This is the alleged ultra vires character, and the consequent invalidity, of the lease made by the Consolidated Traction Company to the other corporation defendant. It is, of course, necessarily true, that the activities of a corporation must be confined within the limits prescribed by the sovereign authority creating it; and especially is it true, that while a corporation has by implication all the ancillary powers necessary to the exercise of expressly granted powers, and to carry into effect the purposes of its creation, it can exercise no others that are not expressly granted. In this case, the power of these two corporations defendant, the one to be lessor and the other the lessee, of the property, rights, franchises and privileges which the lessor company had acquired by the legislative authority that granted it corporate existence, is not to be implied from any general power connected with the object of their creation. As the power to negotiate and execute the lease here in question has been challenged, those who would sustain it, must point to some express authority of the legislature of the state by which these corporations defendant were created. We find that both of them were formed under an act of the legislature of New Jersey, approved March 14, 1893, and constituting chapter 172 of the General Public Laws of 1893. The title of the act is, "An act to authorize the formation of traction companies for the construction and operation of street railways, or railroads operated as street railways, and to regulate the same." The act is a long one, and prescribes, with much detail, the manner in which a corporation may be formed and organized under it. It carefully defines and limits the powers and franchises, which such corporations may exercise and enjoy. Its sixteenth section contains the following grant of power:

"Any corporation created under this act may lease the property and franchises of any other corporation owning or operating any street railway or other railroad operated as a street railway, or any turnpike or plank road,

or any motor power or traction company and such other corporation and corporations are hereby authorized to make such lease and after such lease the corporation created under this act may use and operate the franchises and property of such corporation or corporations so leased upon such compensation to be made to the lessee company as such respective lessor corporation may have been entitled to demand from persons using or traveling in or upon the property of such lessor corporation: provided, that all rights of creditors and all liens upon the property of the corporation lessor, and all privileges and immunities of such lessor corporation shall be preserved unimpaired to the same extent as if such lease had not been made; and all debts, liabilities and duties of such lessor corporation shall thenceforth attach to the lessee corporation, and be enforced against or be enjoyed by it to the same extent and in the same manner as they were enforceable against or enjoyed by the lessor corporation: and·provided further, that no greater tolls or charges shall be made or demanded by any corporation created under this act than were or are authorized to be charged and collected for the same service by the corporation or corporations, lessor or lessors in said lease."

An act of the legislature, approved on the said 14th day of March, 1893, but said to have been passed and approved prior to the act above referred to, is entitled "An act to authorize street railway companies, or companies owning railroads operated as street railways, to lease their property and franchises to traction companies, and to prescribe a method therefor." It is printed in the volume of General Public Laws of 1893, just before the one quoted from, and is chapter 169, the act quoted from being chapter 172. The first section of this chapter 169 is as follows:

"That it shall and may be lawful for any company owning any street railway or railways or any company owning any railroad operated as a street railway, whether such lessor company or companies are incorporated under any general or special act of this state, to lease their property and franchises to any traction company created under the laws of this state for such term or terms, upon such condition or conditions as to the use and operation of the property of the corporation, the enjoyment of privileges or immunities of such lessor corporation and the amount of rent to be paid therefor, and the manner of making payment of said rent, and such other conditions, limitations and restrictions as said lessor and lessee corporations may agree upon."

Both this chapter and chapter 172 contain identical provisions for appraising and paying the value of the stock of dissentient stockholders. Section 17 of chapter 172 is almost a verbatim copy of section 2 of chapter 169, and is as follows:

"Any stockholder of any company whose property and franchises shall have been leased to a corporation created under this act who shall not assent to lease, or who shall resist or object to the making thereof, may at any time within thirty days after the making of such lease as in this act provided apply by petition to the circuit court of the county in which the chief office of the lessor corporation may be kept or to a judge of said court in vacation, if no such court sits within such period, on reasonable notice to said company, to appoint three disinterested persons to estimate the damage, if any, done to such stockholder by said proposed lease; and whose award, or that of a majority of them, when confirmed by the said court, shall be final and conclusive; and the persons so appointed shall also appraise said stock of such stockholder at the full market value thereof without regard to any depreciation or appreciation in consequence of the said lease; and the lessor company may at its election either pay to the said stockholder the amount of damages so found and awarded, if any, or the value of the stock so ascertained and determined, and upon the payment of the value of the stock as aforesaid the said stockholder shall transfer the stock so held by

him to said lessor company to be disposed of by the directors of said company or to be retained for the benefit of the remaining stockholders; and in case the value of said stock as aforesaid is not so paid within thirty days from the filing of the said award and confirmation by said court, and notice to said lessor company, the damages so found and confirmed shall be a judgment against said company, and collected as other judgments in said court are, by law, recoverable."

As both of the corporations lessor and lessee respectively, and defendants herein, were formed and organized under the provisions of chapter 172, it would seem that there could be no doubt, that plenary capacity to stand in the mutual relation towards each other, of lessor and lessee, was conferred upon said corporations by section 16 of said chapter. If it should be objected, however, that the words, "such other corporation and corporations are hereby authorized to make such lease," are insufficient, for any reason, to confer the requisite power on the lessor company, the prior act constituting chapter 169, is direct and ample for that purpose. But we are of opinion that section 16 of chapter 172 of the act under which both corporations were organized, confers the requisite authority upon both corporations.

The lease that has been executed, and here the subject of controversy, was made pursuant to the careful provisions of the said section 16. It complies with all its requirements as to protecting all rights of creditors and liens upon the property of the corporation lessor, and all privileges and immunities of such lessor corporation. It also provides for the assumption by the lessee company of all debts, liabilities and duties of the lessor corporation. As has been seen, section 17 of said act provides a mode by which any dissentient stockholder may be compensated, if he should fear the effects of such lease upon the value of his stock, or if for any other reason he desires to retire from the corporation without loss. This provision would seem to have been adopted out of cautious solicitude for the rights of possible dissentient stockholders. Even in a case where a lease or consolidation was authorized, by a legislative act subsequent to the act under which the corporation was organized, such a provision as that of section 17, above quoted, has been held a competent exercise of the power of eminent domain. It was construed to be a taking of private property for a public use, and the fact that it was for a public use has been held to be settled by the legislative act providing for the taking. Black v. Canal Co., 24 N. J. Eq. 455. But in the case in hand, no such question, as to whether, or how far, dissenting stockholders would be bound by a subsequent legislative provision authorizing a lease, can arise. The act, under which both of these corporations were organized, and the legislation existing at the time, expressly conferred upon these corporations, from the beginning of their existence, the power to be either lessor or lessee. Every stockholder, including these complainants, in subscribing for his stock, took it subject to the conditions of the act, under the authority of which it was issued, and of the relevant provisions of law existing at the time, and were bound by their several requirements and conditions. Every stockholder knew, when he subscribed, or was bound to know, that the corporation had power to lease the property, and they also knew that if they did not assent, or did assent, what provision had been made, out of abun-

dant caution, for their benefit. These provisions entered into the contract of the stockholders, inter sese, and they took their stock upon the express condition that they would be bound thereby.

So far, it seems too plain for argument, that lawful authority to be parties to the lease in question, was conferred in express terms upon both of the defendant companies. It is not necessary to dwell long upon certain objections made by complainants, in their argument, to the sufficiency of the acts referred to, to authorize this lease. The objections seem to us hypercritical, and it would be an unnecessary consumption of time to discuss them further than to say that they are, in our opinion, without merit. One objection, however, should receive a passing notice, and that is, that the act constituting chapter 172 of the General Laws of 1893, in its sixteenth section, is unconstitutional, in so far as it attempts, after authorizing corporations created under it to lease the property of other corporations, to confer authority on all such other corporations to make such lease, the constitution of New Jersey providing that every law shall embrace but one object, and that object shall be expressed in its title. This objection would be good, were the lessor corporation created under another and different act. It would in that case, as in the case of Camden & A. R. Co. v. May's Landing R. Co., 48 N. J. Law, 560, 7 Atl. 523, be an amendment to a charter subsisting under a different act. In the case before us, however, both companies derived their corporate powers from the same act, and if the power to lease the property of another corporation be sufficiently embraced in the general object expressed in the title, the power of such a corporation to make a lease, would also be so embraced.

The objection most seriously and strenuously urged, is, that although express power may be given to a corporation to lease, that power cannot, in the absence of express legislative authority to the contrary, be exercised without the assent of all the stockholders. It is argued, with some plausibility, that without express legislative authority, a corporation could not make a lease of its property and franchises, even with the assent of all its stockholders, and that express legislative authority to make a lease is only a conferring of a power not existent without such legislative grant, upon the whole body of stockholders. Many cases have been cited in the brief and in the argument, to support these propositions. The distinction, however, between these cases and the one at bar, is, that the former concern grants of legislative power to lease, to corporations already in existence, and whose stockholders have subscribed under the conditions of the original charter, by which no such power was given. The implied contract between the stockholders, inter sese, in such cases, is, as already stated, that no such additional power, so radical in its nature, though conferred by legislative authority, shall be capable of being exercised without the assent of all the stockholders. In the case before us, however, the power to lease was conferred by the act under which both corporations were formed. It was inherent in their organization and corporate existence, and was a condition upon which every stockholder received his stock. It was competent for the legislature to have imposed in its creative act, any conditions it

pleased, upon the stockholders of the corporation which it had called into existence. The power to lease having been so given, without prescribing any mode in which it was to be exercised, it must be classed with the general powers conferred by a charter, which are to be exercised by the majority of corporators or stockholders. This is the general rule, applicable to all corporate powers originally conferred by charter, and inherent in the corporate organization in its inception. It is unreasonable to suppose that a power conferred by the creative act, should, in the absence of any other mode prescribed for its exercise, be made to depend upon the unanimous consent of the stockholders. Corporate existence might be so imperiled, and corporate ends defeated. The view stated has the sanction of well-considered judgments in American and English cases, which have been summarized by Morawetz, in his work on Private Corporations (section 407), as follows:

"It is evidently the intention of all parties who join in creating a corporation, that all acts which are done by the company under its charter shall be done in the usual manner, and by the agencies through which a corporation usually acts. The majority in shareholders' meeting, and in some instances the board of directors, are impliedly invested with full powers to do on behalf of the corporation whatever they deem judicious in carrying out the company's chartered purposes. If the charter contains a provision purporting to authorize the corporation to do a certain act, this is not merely a grant of authority from the legislature to the corporation, but it enters into the agreement of the shareholders, and impliedly invests the majority, or the board of directors, with authority to do the act on behalf of the corporation. This is true, although a change in the company's constitution, or an alteration of the character of its main enterprise, be the result. The powers of the majority, or board of directors, under these circumstances, are derived strictly from the agreement of the shareholders."

See, also, sections 475 and 941. See, also, 3 Cook, Corp. § 895, and cases cited.

It should not pass without comment, that in the present case, the lease in question was assented to formally, by more than two-thirds of the stockholders, and informally in writing by every stockholder, save the holders of the 400 shares interested in this litigation, the complainants being the owners of only 100 shares. Courts of equity are reluctant to act in cases where their action would unsettle and disturb enormous interests, especially where most of them are attached to innocent third parties, and to which the interests of those invoking judicial action are overwhelmingly disproportioned. And still more is this the case, where the evidence discloses that those seeking such drastic judicial intervention, have not suffered, and are not likely to suffer pecuniary loss.

It is also contended by complainants, that there is jurisdiction in this court, independently of the grounds heretofore discussed, in that the lease in question, in its effect, takes the private property of the complainants, against their consent, and is in violation of the rights of the complainants, guarantied to them by the constitution of the United States and of New Jersey. If this contention were valid, this proposition would not only be a ground of jurisdiction, but one justifying, in part at least, the relief sought by complainants. The gravamen of this charge is, that section 17 of the act under which the companies

defendant were formed, provides for the condemnation of the stock of any "stockholder of any company, whose property and franchises shall have been leased to a corporation created under this act, who shall not assent to the lease, or who shall resist or object to the making thereof," when no public use justifies the same, the contention being that this would be a taking of private property, without due process of law, in contravention of the constitutions of the United States and of the state of New Jersey. The fallacy of this contention consists in the ignoring of the fact that all stockholders of the lessor company are bound by the conditions imposed by the legislative act which created their corporation, and have impliedly assented to the exercise of the power to lease, when authorized by the lawfully constituted directors of the company, and by the holders of a majority of the stock therein. There has, consequently, been no taking of the property of the dissentient stockholders in the constitutional sense. The authority for appraising the stock of such minority holders, and paying them the value of it, need not in such a case have been provided for, nor are the proceedings authorized by section 17 of chapter 172, or by section 2 of chapter 169, strictly proceedings for condemnation of private property for public use. They only provide a way, in which minority stockholders may receive the present value of their stock, and retire from the corporation, when a lease, legally authorized, and to which they object, has been approved by a majority of the stockholders. It is, moreover, to be noted, that the argument of complainants seems to go also upon the assumption, that the provision for assessment and payment is obligatory upon the dissentient stockholders, whereas, it is entirely optional with such stockholders to avail themselves of this provision, or not. It is needless to further discuss the elaborate argument of complainants' counsel, under this head, except to say that the cases cited to support their contention, so far as we have examined them, are very different from the present; being cases where the legislature has sought to condemn holdings of minority stockholders in their corporation, by legislation enacted after the stockholders' rights under their charter had accrued.

For the reasons stated, we think the bill of complaint should be dismissed, with costs, and it is so ordered.